**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| LOUISE BROWN; THOMAS DIXON; and WILLIAM J. HAMILTON, III,      ) ) ) | |
| Plaintiffs,    ) ) | No. 2:25-cv-02649-DCN |
| vs.    ) ) | **ORDER** |
| CITY OF CHARLESTON, *as incorporated municipality and political subdivision of the State of South Carolina*; and WILLIAM S. COGSWELL, JR., *Mayor of the City of Charleston, in his official capacity*,    ) ) ) ) ) ) | |
| Defendants.    ) _____) | |

This matter is before the court on plaintiffs Louise Brown ("Brown"), Thomas Dixon ("Dixon"), and William J. Hamilton, III's ("Hamilton") (collectively, "plaintiffs") motion for expedited hearing, temporary restraining order ("TRO") and mandatory injunction, ECF No. 2. For the reasons set forth below, the court denies this motion.

## I.  BACKGROUND

Plaintiffs are social justice activists who plan on holding a public demonstration or protest on Daniel Island on Saturday, April 5, 2025. ECF No. 1, Compl. ¶¶ 2–8; ECF No. 1-5 at 2–3. In general, plaintiffs believe Congresswoman Nancy Mace ("Representative Mace") is not adequately representing her district on a number of issues, and plaintiffs wish to highlight these issues by holding a demonstration outside of her Daniel Island office. See generally ECF No. 1-6 at 9–12. Plaintiffs specifically chose April 5 because that is the day of the Capital One Charleston Open, a tennis tournament on Daniel Island near where plaintiffs propose to hold the April 5 demonstration. See id.;

ECF No. 1-5 at 2.  Plaintiffs believe the crowds near the tennis tournament will give them a large audience for their planned demonstration.  ECF No. 1-5 at 2.

**A. The City's Permit Application Process**

Defendant City of Charleston (the "City") requires that those engaging in a "First Amendment demonstration" consisting of twenty-five (25) or more people get a First Amendment demonstration permit from the chief of police.  Charleston, S.C., Code § 25-39(a).  According to the City's code, a First Amendment demonstration is defined as "any demonstration, assembly, picketing, speechmaking, marching, protesting, vigil or religious service, and all other like forms of conduct, in or upon any street including the sidewalk area thereof, park or other public place in the city, that involve the communication or expression of views or grievances, engaged in by one or more persons, the conduct of which is reasonably likely to draw a crowd or onlookers."  Id. § 25-36. An applicant must apply for a permit "not less than three (3) days nor more than thirty (30) days before the date on which it is proposed to conduct the demonstration."  Id. § 25-41(b).

> The chief of police shall issue a permit as provided for hereunder when, from a consideration of the application and from such other information as may otherwise be obtained, he finds that:
>
> > (1) The conduct of the demonstration will not substantially interrupt the safe and orderly movement of other traffic, pedestrian and vehicular, contiguous to its route.
> >
> > (2) The conduct of the demonstration will not require the diversion of so great a number of police officers of the city properly to police the line of movement and the areas contiguous thereto as to prevent normal police protection to the city.
> >
> > (3) The concentration of persons at assembly points of the demonstration will not unduly interfere with proper fire and police protection of areas contiguous to such assembly areas.

(4) The conduct of such demonstration will not interfere with the movement of firefighting equipment enroute to a fire.

(5) The conduct of the demonstration is not reasonably likely to cause injury to persons or property, or to provoke disorderly conduct.

(6) The demonstration is scheduled to move from its point of origin to its point of termination expeditiously, without unreasonable delays enroute and without passing by any location more than once.

(7) If the demonstration is to be solely on the sidewalk areas of the city, the demonstration shall be in single file only of persons participating, with no animals, vehicles or other nonhuman objects except reasonably sized signs individually carried in the line of procession.

Charleston, S.C., Code § 25-44. When the chief of police denies a portion of a First Amendment demonstration permit, the code empowers him to "authorize the conduct of the demonstration on an alternative day, at an alternative time, or over a route different from that named by the applicant. An applicant desiring to accept an alternate permit shall within two (2) days after notice from the chief of police or at least twenty-four (24) hours prior to the time of the event, whichever is earlier, file a written notice of acceptance with the chief of police." Charleston, S.C., Code § 25-47.

### B. Plaintiffs' Application

In an email dated March 13, 2025,[1] Hamilton informed Timothy Dasher ("Dasher") of the Charleston police department about the April 5 Demonstration, and this email linked to a flyer with more details regarding plaintiffs' plans. ECF No. 1-5 at 1. Plaintiffs allege that they did not receive a response from the City on this email. Compl.

---

[1] In their complaint, plaintiffs allege that Hamilton sent this email to Dasher on February 28, 2025, at 1:30 p.m. See Compl. ¶¶ 16–17. However, the copy of the email attached to plaintiffs' complaint is dated March 13, 2025, at 1:54 p.m. See ECF No. 1-5 at 1.

3

¶ 18.  On March 17, 2025, plaintiffs submitted a First Amendment demonstration permit application to the City (the "Application").  ECF No. 1-6.  In the Application and documentation attached to the Application, plaintiffs explained that they plan to hold the April 5 demonstration in a public right of way in front of Representative Mace's office along River Landing Drive on Daniel Island.  See id. at 2, 7, 9.  Plaintiffs' proposed location is approximately 100 feet by 20 feet and that the protestors would stay five feet from the roadway.  Id. at 9.  Plaintiffs also explained that they planned to use a 10x10 foot pop up tent, which would serve as a place of respite for the elderly protesters, and a Fender 150 sound system with speakers from the tent.  Id. at 9–10.  Plaintiffs planned to have the demonstration from 1:00 p.m. to 4:00 p.m. and that protesters would serve in two 90-minute shifts.  Id. at 9.  Plaintiffs anticipate approximately 150 protesters per shift for a total of 300 demonstrators between the two.  Id. at 2.  Additional protesters would have to wait in an overflow area in a nearby park.  Id.

Ultimately, the City granted the Application in part and denied it in part.  The City granted the Application to have a demonstration between 1:00 p.m. and 4:00 p.m., consisting of two 90 minute shifts with 150 participants per shift.  ECF No. 1-7 at 1. However, the City denied the portions of Application in three respects: (1) the original location of the demonstration, (2) the original date of the demonstration, and (3) the use of a tent.  Id. at 1–2.  As for the location of the demonstration, the City explained that the proposed location "will not safely accommodate the number of participants expected given the proximity to congested roadways and lack of barriers between participants and the roadway which poses a public safety concern for participants."  Id.  Thus, the City suggested an alternative location, which is a parking lot around the corner from the

proposed location.  See id. at 2–3.  As for the date, the City explained that there are several events happening in Charleston on April 5 (namely, the Cooper River Bridge Run and the Credit One Charleston Open) and that the police department could not spare the officers needed to ensure the safety of the demonstrators on April 5.  Id. at 1.  Thus, the City proposed April 12, 2025, as an alternative date for the demonstration.  Id. at 2–3.  Finally, the City explained that "[u]se of a tent should be requested and authorized by the City of Charleston Special Events Committee."  Id. at 1.

## C. Procedural History

Plaintiffs filed this action on March 28, 2025.  ECF No. 1, Compl.  They argue that the City's actions violate the First Amendment and they seek a mandatory injunction and TRO.  Id. ¶¶ 12–47.  Specifically, the TRO and mandatory injunction they seek would require the City "to issue a permit for the demonstration as requested by the plaintiffs and to provide reasonable levels of police protection for such demonstration and to maintain good civic order in the immediate vicinity."  Id. ¶ 46.  They also seek a declaratory judgment that the City's "Ordinance is vague, overbroad and grants an intolerable level of unfettered discretion to the police department in the issuance of permits."  Id. ¶ 49.  Finally, plaintiffs seek attorney's fees in connection with bringing this action.  Id. ¶¶ 51–58.  Plaintiffs moved for a TRO on the same day they filed their motion.  ECF No. 2.  Defendants responded in opposition to the plaintiffs' motion for a TRO on April 3, 2024.  ECF No. 8.  Also on April 3, 2024, plaintiffs emailed the court a memorandum of law in support of their motion, but plaintiffs have yet to file this document in the court's electronic filing system.  On April 4, 2025, the court held a

hearing on the motion.  ECF No. 9.  The matter is fully briefed and ripe for the court's review.

## II.  STANDARD

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)), modified in part, 906 F. Supp. 2d 463 (D.S.C. 2012), aff'd, 720 F.3d 518 (4th Cir. 2013).  The party seeking a preliminary injunction must make a "clear showing" that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 22 (2008).  To succeed, the movant must satisfy all four of the Winter factors.  Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009), vacated and remanded, 559 U.S. 1089 (2010), reissued in relevant part by per curiam published order, 607 F.3d 355 (4th Cir. 2010).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter, 555 U.S. at 24.

"A preliminary injunction may be characterized as being either prohibitory or mandatory."  League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 235 (4th Cir. 2014).  Plaintiffs in this case seek a mandatory injunction.  See Compl. ¶¶ 43–47. Mandatory relief is "disfavored, and warranted only in the most extraordinary circumstances."  S.C. Progressive Network Educ. Fund v. Andino, 493 F. Supp. 3d 460, 466 (D.S.C. 2020) (quoting Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994)).

"Mandatory preliminary injunctions . . . should be granted only in those circumstances when the exigencies of the situation demand such relief." Pierce v. N.C. State Bd. of Elections, 97 F.4th 194, 209 (4th Cir. 2024) (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)).

### III.   DISCUSSION

Plaintiffs have simply not met the exceptionally high standard warranting a mandatory injunction. Indeed, though plaintiffs are passionate about their political positions, this court must follow the law in making its decisions, and plaintiffs have largely neglected their duty to explain how their arguments in this case are supported by legal authority. In particular, plaintiffs have not indicated whether they assert their arguments on the City's permitting process as a facial or as-applied challenge.[2] Nevertheless, the court denies their motion under either theory.

---

[2] The difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry. Under a facial challenge, a plaintiff may sustain its burden in one of two ways. First, a plaintiff asserting a facial challenge "may demonstrate 'that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep.' Second, a plaintiff asserting a facial challenge may also prevail if he or she "show[s] that the law is 'overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' Under either scenario, a court considering a facial challenge is to assess the constitutionality of the challenged law "without regard to its impact on the plaintiff asserting the facial challenge." In contrast, an as-applied challenge is "based on a developed factual record and the application of a statute to a specific person[.]"

Educational Media Co. at Va. Tech, Inc. v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (citations omitted). As the Supreme Court recently explained, there is a less demanding standard in First Amendment cases to establish a facial challenge than in other types of litigation. Moody v. Net Choice, LLC, 603 U.S. 707, 723 (2024). "The question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' So in this singular context, even a law with 'a plainly legitimate sweep' may be struck down in its entirety. But that is only if

"An ordinance that requires individuals or groups to obtain a permit before engaging in protected speech is a prior restraint on speech." Cox v. City of Charleston, SC, 416 F.3d 281, 284 (4th Cir. 2005)). "Although there is a 'heavy presumption' against the validity of a prior restraint, the [Supreme] Court has recognized that government, in order to regulate competing uses or public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally." Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992) (citations omitted) (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)). "To withstand constitutional scrutiny, such a regulation must: (1) 'be narrowly tailored to serve a significant governmental interest,' (2) 'leave open ample alternatives for communication,' and (3) contain 'narrow, objective, and definite standards to guide the licensing authority.'" Green v. City of Raleigh, 523 F.3d 293, 300 (4th Cir. 2008) (quoting Nationalist Movement, 505 U.S. at 130–31). "To be narrowly tailored, an ordinance need not be the least restrictive or least intrusive means of effectuating the relevant interests . . . but it may not burden substantially more speech than is necessary to further the government's legitimate interests." Id. at 300–01 (internal quotation marks omitted) (alteration in original) (quoting Cox, 416 F.3d at 284). "[A] city has a 'legitimate interest in maintaining the safety, order, and accessibility of its streets and sidewalks.'" Id. at 301 (quoting Cox, 416 F.3d at 284).

The closest plaintiffs come to alleging the facial invalidity of the ordinance is when the assert in their complaint that the City's permitting ordinance "is vague,

---

the law's unconstitutional applications substantially outweigh its constitutional ones.'" Id. (alterations in original) (citations omitted) (quoting Americans for Prosperity Foundation v. Bonta, 594 U.S. 595, 615 (2021)).

overbroad and grants an intolerable level of unfettered discretion to the police department in the issuance of permits." Compl. ¶ 49. This conclusory allegation in insufficient, and the court finds that plaintiffs have not demonstrated a likelihood of success in this argument. To reiterate, the ordinance outlines seven considerations for the chief of police to consider when determining whether to issue a demonstration permit. See Charleston, S.C., Code § 25-44. In general, these considerations relate to the police's ability to ensure public safety, and when these seven criteria are met, the ordinance instructs that the chief of police "shall issue" a demonstration permit. See id. In Thomas v. Chicago Park District, the Supreme Court upheld an ordinance that provided similar guidance to park officials on when to deny permits.[3] 534 U.S. 316, 323 (2002). Just as in Chicago Park District, the City's ordinance articulates "grounds [which] are reasonably specific and objective, and do not leave the decision 'to the whim of the administrator." Id. (quoting Nationalist Movement, 505 U.S. at 133). Thus, plaintiffs have not shown that they are likely to succeed on their facial challenge to the validity of the ordinance.

Likewise, plaintiffs have not shown that they are likely to succeed to the extent they bring an as-applied challenge to the City's denial of their Application. The City explained that it denied plaintiffs' Application on the date of the protest because of its concerns related to safety and lack of police resources on the crowded April 5 weekend, which will include both the Bridge Run and the Charleston Open. See ECF No. 1-7 at 1; see also ECF No. 8-1, Stanley Aff. ¶¶ 7–10. During the hearing, the City intimated that,

---

[3] During the hearing and in its response brief, the City made a direct comparison between its ordinance and the ordinance upheld by the Supreme Court in Chicago Park District. See ECF Nos. 8 at 5; 9. Thus, plaintiffs have had multiple opportunities to distinguish the case at bar from Chicago Park District but have, instead, declined to offer the court any reference to this binding Supreme Court precedent.

but for the Bridge Run, the plaintiffs' Application would have been approved, ECF No. 9, and the City offered to allow plaintiffs to hold their demonstration the very next weekend, ECF No. 1-7 at 2. The City also explained that its denial of plaintiffs' Application on the place for the demonstration was because plaintiffs could not safely fit approximately 150 demonstrators in an area approximately five feet from a busy highway, without a curb or guardrail, and near the entrance ramp to I-526. See ECF No. 1-7 at 1; 1-6 at 9 (plaintiffs demonstration plans explaining that they will "stay 5 feet from the roadway [and t]here is no sidewalk and no real reason for pedestrians to transit this area"); Stanley Aff. ¶¶ 8–9.

Not only has the City offered reasonable, content-neutral justifications for its decisions, it has also left open ample alternatives for communication by permitting plaintiffs to protest the following weekend in a different location approximately 100 yards away, where there is a sidewalk.[4] See ECF No. 8-1, Stanley Aff. ¶ 11. Because the City's application of its ordinance appears to be narrowly tailored to serve its significant government interests, the City has left open ample alternatives for communication, and the City acted in accordance with the ordinance's objective standards to guide the licensing authority, the court finds that plaintiffs are not likely to succeed on the merits of

---

[4] Finally, to the extent the City's decision to deny plaintiffs the ability to use a tent is related to plaintiffs' speaking rights at all, the court notes that the City denied this portion of the application because "[u]se of a tent should be requested and authorized by the City of Charleston Special Events Committee." ECF No. 1-7. Presumably, plaintiffs could have applied for such a permit.

their as-applied challenge.[5]  See Green, 523 F.3d at 300–01.  Thus, the court denies

plaintiffs' motion.[6]

### IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiffs' motion for a TRO

and mandatory injunction.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**April 4, 2025**
**Charleston, South Carolina**

---

[5] During the hearing, plaintiffs indicated that they have worked with the City "dozens" or more times in the past to get demonstration permits and that this is the first time the City has ever denied their request for a permit.  See ECF No. 9.  The court does not understand plaintiffs' position that the City is unconstitutionally targeting their speech when plaintiffs have, evidently, had so much success in working with the City every other time they have requested a similar permit.  This further compels the court to find that the City's content-neutral justifications for denying this Application are legitimate and not pretextual.

[6] During the hearing, plaintiffs indicated that they also wish the court to issue a mandatory injunction requiring that the City permit them to hold a separate demonstration in Washington Park on April 8.  See ECF No. 9.  This request was not included in plaintiffs' motion, ECF No. 2, nor were facts related to the April 8 demonstration pled in plaintiffs' complaint, Compl.  The court therefore finds that this issue is not properly before the court and that the court cannot pass judgment on this request.  Nevertheless, the City intimated that, should plaintiffs apply for a permit to conduct this demonstration, the City would likely approve that application.  See ECF No. 9.